UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONNELL RUSSELL,

                            Petitioner,

            - against -

UNITED STATES OF AMERICA,

                            Respondent.

**ORDER**

23 Civ. 7915 (PGG)
20 Cr. 538 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On September 6, 2023, Donnell Russell filed a <u>pro se</u> petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, arguing that he received ineffective assistance of counsel at trial. (Dkt. No. 1)  For the reasons stated below, Russell's petition will be denied.

**BACKGROUND**

I.      **FACTS**

     A.      **The Indictment**

In an October 8, 2020 indictment, Russell was charged with (1) conspiring to send a threatening communication in interstate commerce, in violation of 18 U.S.C. § 371; and (2) sending a threatening communication in interstate commerce, in violation of 18 U.S.C. § 875(c). (20 Cr. 538, Indictment (Dkt. No. 8))  The indictment alleges that on December 4, 2018, Russell placed a threatening phone call to NeueHouse Madison Square, which was screening a documentary entitled "Surviving R. Kelly."

     B.      **The July 2022 Trial**

Russell proceeded to trial on July 18, 2022.  At trial, he was represented by his retained attorney, Michael Freedman.

The evidence at trial showed the following:

As of December 4, 2018, Russell was serving as the manager of, and an adviser to, the recording artist Robert Sylvester Kelly, a/k/a "R. Kelly." (GX 702, 704, 803; 20 Cr. 538 Trial Transcript ("Trial Tr.") at 85-86)[1]

On December 4, 2018, NeueHouse – a private club and event space located at 110 East 25th Street in Manhattan – hosted a screening of "Surviving R. Kelly." The screening was scheduled for 7:00 p.m. in NeueHouse's basement theatre. (Trial Tr. at 66, 68, 79, 108-09) The film concerns allegations that R. Kelly had sexually abused minor girls and women. Some of the alleged victims were scheduled to speak at NeueHouse after the screening that evening. (GXs 204, 805; Trial Tr. at 64-65) Approximately 70 to 100 people attended the screening. (Trial Tr. at 69, 204)

The evidence at trial showed that Russell repeatedly called NeueHouse throughout the day on December 4, 2018, and tried to convince NeueHouse employees not to proceed with the screening of "Surviving R. Kelly." In a January 19, 2020 YouTube interview that was admitted into evidence at trial, Russell stated: "I called the venue, I was on the phone with them the whole day trying to get them not to air [the "Surviving R. Kelly" film] because it was trademark infringement." (GX 702)

On the day of the screening, Russell – using the alias Brian Nix – sent NeueHouse a cease and desist letter threatening a lawsuit if NeueHouse went forward with the screening. In the letter, Russell claimed that the film infringed on R. Kelly's copyrights and trademarks. (GX 1201) In his calls to NeueHouse – which were made over a cellphone number registered to

---

[1] Cites to the trial transcript reflect the court reporter's original pagination, rather than the page numbers assigned by this District's Electronic Case Files system.

Russell – Russell repeated his claims that the "Surviving R. Kelly" film infringed on R. Kelly's copyrights and trademarks.  (Trial Tr. 204-06; GX 1203; GX 302 at 2; GX 801 ¶ 5)

Russell took other steps to disrupt the screening of "Surviving R. Kelly."  On the morning of the scheduled screening, the Defendant – using the alias "Colon Dunn" and pretending to be an "investigator" – sent executives at the Lifetime channel a PowerPoint presentation seeking to discredit the women who had made allegations against R. Kelly.[2]  (GX 1410, 1410A)  That same day, Russell sent a similar communication to Drea Kelly, R. Kelly's ex-wife, who was scheduled to participate in the panel discussion after the screening.  (GX 1419, 1419A; Trial Tr. at 69)  In his Facebook message to Drea Kelly, Russell writes:  "we have convincing, litigate-able, incontrovertible evidence of the falsity of the allegations of the alleged 'Survivors' and their illegitimate/criminal financial motives."  (GX 1419A)

Russell's efforts to derail the screening were assisted by Kash Jones, a hip-hop journalist who attended the screening and kept Russell advised of what was happening that evening at the NeueHouse theater.  (GX 403, 1311)  For example, in a 7:04 p.m. text to Jones Russell asked, "Are they continuing with the screening." and Jones replied, "Yes."  (GX 1311 at 7)

And in a 7:34 p.m. text message to Kash Jones, Russell again asked, "Is the event still going on."  Jones responded, "Yes."  (GX 403)  A few minutes later, Russell replied:  "The cops may[]be arriving shortly."  (Id.)

At trial, the Government introduced evidence that Russell's residence in Chicago has a landline telephone (the "Russell Landline Phone") that is assigned the number 773-801-1689 (the "1689 Number").  (GX 801; GX 302 at 2-3; Trial Tr. at 122)  The Government also

---

[2]  The Lifetime channel produced "Surviving R. Kelly."  (Trial Tr. at 64)

introduced a stipulation in which Russell agreed that he had used the 1689 Number in 2018 and 2019, and that that same telephone number is listed on invoices of Indybuild, a company he owns.  (See GX 801 ¶ 5; GX 1408A)

Call records for the Russell Landline Phone show that that phone was used to call NeueHouse at 7:37 p.m. and 7:38 p.m.  The first call lasted 23 seconds; the second call lasted 20 seconds.  (GX 301 at 71; GX 302 at 3)

Adrian Krasniqi – NeueHouse's member services manager – testified that he received a phone call at NeueHouse's front desk at about 7:40 p.m.  (GX 301, 302, 701, 803; Trial Tr. at 157-58)  The caller stated that someone at the theater "had a gun and they were going to shoot up the place" (the "threat call").  (Id. at 207)  The caller did not identify himself, but Krasniqi described the caller as a man with "a deep voice."  (Id.)  Krasniqi called 911 and reported the threat call at 7:51 p.m.  (GX 803 ¶ 1; GX 701 at 00:45-00:47; 1:48-1:56; Trial Tr. at 208)

Call records introduced at trial show that the only phone that was used to call NeueHouse's front desk – where Krasniqi received the threat call – between 7:01 p.m. and 7:51 p.m. on December 4, 2018, was a phone assigned the 1689 Number.

When Krasniqi called 911, he told the 911 operator that he had "the caller ID as well as the phone number.  I can speak to the police about that."  (GX 701)  After police officers arrived at NeueHouse, Krasniqi showed them the front desk call log.  Officers then called the 1689 Number four times.  No one answered.  (Trial Tr. at 211; GX 301 at 71; GX 309)  The NeueHouse call log contains two entries reflecting the 1689 Number and a caller ID of "Donnell Russell."  (GX 209)  The Government also introduced cell-site data showing that the Defendant's December 4, 2018 communications from his cellphones utilized cell towers in or

around the Chicago address assigned to the Russell Landline Phone.  (GX 301, 501, 801, 1101-1107; Trial Tr. at 87-88)

In an 8:05 p.m. text message to Kash Jones, Russell instructed Jones to "[d]elete those messages about 50," referring to Russell's earlier statement that "[t]he cops may[]be arriving shortly."  (GX 403)  Russell himself deleted the text messages he had exchanged with Jones regarding the expected arrival of the police at NeueHouse.  (GX 808; Trial Tr. at 289-90)

On July 22, 2022, the jury returned a verdict finding Russell guilty on the substantive threatening communication charge (Count Two), and not guilty on the conspiracy charge (Count One).  (Trial Tr. at 437; 20 Cr. 538, Verdict Form (Dkt. No. 69))

## C.    Post-Trial Proceedings

This Court denied Russell's motions for a judgment of acquittal or a new trial on November 4, 2022.  (20 Cr. 538, Dkt. No. 87)

On December 19, 2022, this Court sentenced Russell to one year imprisonment, to be served concurrently with a twenty-month sentence imposed in the Eastern District of New York in a related case.[3]  (20 Cr. 538, Dec. 19, 2022 Sent. Tr. (Dkt. No. 97) at 22)

## D.    Russell's Habeas Petition

On September 6, 2023, Russell filed a pro se petition to vacate or set aside his sentence pursuant to 28 U.S.C. § 2255.  (23 Civ. 7915, Dkt. No. 1)  In his petition, Russell contends that his lawyer at trial, Michael Freedman, provided ineffective assistance of counsel.

---

[3]  At the time of trial, Russell faced charges in the Eastern District of New York related to his stalking of one of R. Kelly's alleged victims.  On July 26, 2022 – after his conviction in the instant case – Russell pleaded guilty to interstate stalking in violation of 18 U.S.C. § 2261A(2)(B) in the Eastern District.  See United States v. Russell, 20 Cr. 427 (E.D.N.Y. Nov. 11, 2022), Dkt. No. 31 (Govt. Sent. Br. at 1-2).

On October 31, 2023, Russell filed an attorney-client privilege waiver concerning his communications with Freedman.  (23 Civ. 7915, Dkt. No. 15)  Freedman filed an affidavit concerning Russell's ineffective assistance claims on December 1, 2023 (the "Freedman Affidavit").  (20 Cr. 538, Dkt. No. 128)

The Government filed its opposition to Russell's habeas petition on January 18, 2024.  (20 Cr. 538, Dkt. No. 134)

## DISCUSSION

In asserting ineffective assistance of counsel, Russell complains that Freedman (1) "violat[ed] [his] fundamental right to testify and fail[ed] to advise him of that right"; and (2) failed to investigate and present evidence regarding Michael Williams, whom Russell now claims made the threat call to NeueHouse.  (23 Civ. 7915, Petition (Dkt. No. 1) at 4-5)

## I.    LEGAL STANDARD

Section 2255 provides that

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).  Accordingly, under Section 2255, "a federal prisoner may move the sentencing court to vacate, set aside, or correct the sentence on the ground that such sentence was illegally imposed."  Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009).

The Supreme Court has established a two-part test for habeas petitions premised on ineffective assistance of counsel:

> First, the [petitioner] must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.

> Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).  A claim for habeas relief "must be rejected if the defendant fails to meet either the performance prong or the prejudice prong."  Bennett v. United States, 663 F.3d 71, 85 (2d Cir. 2011).

"A criminal defendant has a high burden to overcome to prove the deficiency of his counsel."  Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006).  "Judicial scrutiny of counsel's performance must be highly deferential."  Strickland, 466 U.S. at 689.  Indeed, in performing the first prong of the Strickland analysis, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[,]" as "[t]here are countless ways to provide effective assistance in any given case."  Id.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]"  Id. at 690.

Under the second prong of the Strickland test, petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  In applying this standard, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

"Unless the [Section 2255] motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  28 U.S.C. § 2255(b).  "To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a 'plausible' claim of ineffective assistance of counsel, not that 'he will necessarily succeed on the claim.'"  Puglisi, 586 F.3d at 213 (quoting Armienti v. United States, 234 F.3d 820, 823 (2d Cir. 2000)).  In evaluating

whether a hearing is required, "a district court need not assume the credibility of factual assertions . . . where the assertions are contradicted by the record in the underlying proceeding." Id. at 214.  "[I]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Id. at 213 (internal quotation and citation omitted)

## II.   ANALYSIS

### A.   Russell's Failure to Testify

Russell asserts that Freedman "failed to advise Russell of his fundamental right to testify and . . . failed to honor Russell's decision to exercise his right to testify."  (23 Civ. 7915, Def. Br. (Dkt. No. 2) at 3)

This assertion is flatly contradicted by the trial record.  On July 21, 2022 – after hearing the lawyers' arguments concerning Defendant's Rule 29 motion, and reserving decision (Trial Tr. 291-298), the Court asked Freedman "is there going to be a defense case?"  Freedman answered, "No, your Honor."  (Id. at 298)  The Court then allocuted Russell as to his decision not to testify:

> THE COURT:  Okay. I did have some questions for Mr. Russell before we take our recess.  Mr. Russell, I've asked your lawyer if there's going to be a defense case.  He has told me there will not be a defense case.  So, first, I need to make sure that you have talked with Mr. Freedman about whether you should testify in this trial.  Have you consulted with him about that?
>
> THE DEFENDANT:  Yes, your Honor.
>
> THE COURT:  And you understand, Mr. Russell, that you have an absolute right to testify in your defense if you wish.  You understand you have that right?
>
> THE DEFENDANT:  Absolutely.
>
> THE COURT:  And you've spoken with Mr. Freedman about whether it's in your interest to testify in this case, correct?
>
> THE DEFENDANT:  Yes, sir.

THE COURT:  And as a result of your conversations with Mr. Freedman, have you concluded that it's not in your interest to testify in this case?

THE DEFENDANT:  Yes, your Honor.

(Trial Tr. at 299-300)

In sum, at the close of the Government's case, Russell told the Court that (1) he was aware of his absolute right to testify in his own defense; (2) he had discussed his decision about whether to testify with Freedman; and (3) in light of Russell's discussions with Freedman, he had decided that it was not in his interest to testify at trial.  (Id.)

Trial counsel Freedman has submitted an affidavit that confirms the statements Russell made at trial.  Freedman states that, "[o]n numerous occasions prior to trial, I informed Mr. Russell of his right to testify or not to testify.  I also explained to him that the decision whether to testify or not to testify was his decision to make and he could make it at any time up until the close of the government's case when the Court would ask us if we intended to present a defense case."  (20 Cr. 538, Freedman Aff. (Dkt. No. 128) ¶ 4)

Freedman also reports that

> [i]n a text message exchange with Mr. Russell on July 17, 2022, the day before trial began, [he] told Mr. Russell "Re your testimony, we'll keep discussing but I'm now really thinking it adds very little and it protects you from a lot of [sic] you don't testify." Mr. Russell responded to that message with a thumbs up emoji.

(Id. ¶ 5)[4]

Freedman goes on to say that "[d]uring trial, Mr. Russell and I continued to discuss the issue of his testimony"; that Freedman "do[es] not recall Mr. Russell telling [him] during the trial that he wanted to testify"; and that "[o]n July 21, 2022, Mr. Russell did not tell

---

[4]  In a motion for bail pending resolution of his habeas petition, Russell cites to this same text message exchange, including his "thumbs up" emoji response.  (Russell Mot. for Reconsid. of Bail, Ex. 1 (Dkt. No. 17-1) at 7)

[Freedman] anything to suggest that he had changed his mind about having decided not to testify or that he wished to testify." (20 Cr. 538, Freedman Aff. (Dkt. No. 128) ¶¶ 6-7, 10)

Apart from the self-serving statements in his habeas petition, there is no evidence that Russell (1) didn't understand that he had a right to testify; or (2) told Freedman before or during trial that he wanted to testify. Indeed, all the credible evidence – including Russell's contemporaneous statements to the Court and Freedman's account in his affidavit – is to the contrary.[5] Accordingly, Russell has not demonstrated that Freedman provided ineffective assistance of counsel.

Nor has Russell demonstrated that he suffered prejudice as a result of his failure to testify. Given the overwhelming evidence that Russell made the threat call, there is no reason to believe that his denial on the stand would have changed the outcome.

The Government's evidence at trial included (1) Russell's YouTube interview, in which he stated that he "was on the phone with [NeueHouse] the whole day trying to get them not to air [the "Surviving R. Kelly" film]"; (2) NeueHouse employee Adrian Krasniqi's testimony that he received the threat call at NeueHouse's front desk at approximately 7:40 p.m.,

---

[5] In his reply papers, Russell claims – for the first time – that during trial Freedman discouraged Russell him from testifying, saying that "providing witness testimony in the Southern District's case would cause the prosecutors in the [Eastern District of New York case] to pursue charges against his mother." (23 Civ. 7915, May 4, 2024 Russell Aff. (Dkt. No. 33) ¶ 26)

Russell does not explain why the Eastern District prosecutors had or would have any investigative interest in his mother, or why Russell's decision about testifying in the Southern District case would affect the Eastern District prosecutors' decision "whether to pursue charges against his mother." In any event, this belated and implausible allegation does not bear directly on Russell's core assertions that (1) he did not understand that he had a right to testify; and (2) he had told Freedman that he wanted to testify, but Freedman did not "honor Russell's decision to exercise his right to testify." See 23 Civ. 7915, Def. Br. (Dkt. No. 2) at 3. Russell's core assertions are entirely rebutted by his contemporaneous statements to the Court and the account Freedman gives in his affidavit.

and phone records indicating that the only calls made to NeueHouse's front desk at that time

were from Russell's home phone; (3) cell site location data placing Russell in the vicinity of his

residence at the time of the threat call; (4) the NeueHouse call log showing two entries reflecting

Russell's phone number and a caller ID of "Donnell Russell"; (5) Krasniqi's testimony that he

provided police with Russell's phone number shortly after receiving the threat call; and (6)

Russell's text message to Kash Jones at NeueHouse – just minutes before the threat call was

made – stating that "the cops may[]be arriving shortly."  (GX 403)

   Russell argues, however, that "his testimony would have exonerated him,"

because his

> demeanor, his vocabulary, his professional background, his Midwestern accent
> and his detailed knowledge of the substance of the "cease and desist" calls would
> have immediately registered with everyone in the courtroom and made clear that
> Russell was the "cease and desist" caller but not the "threat" caller.  Moreover,
> Russell could have truthfully testified that he never called in a threat to the
> Neue[H]ouse theater.

(23 Civ. 7915, Def. Br. (Dkt. No. 2) at 3)

   Russell's proposed testimony amounts to little more than a "pious denial[]" of

guilt.  It does not address or undermine the evidence establishing Russell's responsibility for

making the threat call.  Rega v. United States, 263 F.3d 18, 24 (2d Cir. 2001).

   To the extent that Russell claims that – if he had testified – the jury would have

heard the sound of his voice, and concluded that he did not make the threat call, the Freedman

Affidavit explains how this tactic could have backfired:

> During Mr. Medrano's testimony, the government played a video recording from
> several years ago of Mr. Russell wearing a Chicago Bears hat and speaking to an
> interviewer.  I told Mr. Russell I thought this evidence helped our argument that
> Mr. Russell did not sound like someone from Brooklyn or like Method Man,
> which is how Mr. Krasniqi had described the voice of the threat caller.  I also
> pointed out to Mr. Russell that his voice presently sounded thicker or hoarser to
> me than when I first met him in the spring of 2021 because he was still suffering
> the effects of the severe respiratory disease for which he was hospitalized in the

summer of 2021.  I expressed to Mr. Russell that if the jury heard his voice as it
sounded during trial, it might undermine the argument I wanted to make based on
the recording as described above.

(20 Cr. 538, Freedman Aff. (Dkt. No. 128) ¶ 6)

Freedman also explained to Russell other reasons why it would not be

advantageous for him to testify:

> I . . . explained that there are risks in any criminal case when a defendant testifies
> and is subject to cross-examination.  In this case, I also noted to Mr. Russell that
> the government had issued him an "if, as, when" subpoena for documents and
> communications in the event he testified and explained that he would need to be
> prepared to respond to the subpoena if he testified.  I also informed Mr. Russell
> that if he testified, he ran the risk of "opening the door" to other issues that would
> otherwise have been kept out of the trial.  Additionally, I explained to Mr. Russell
> that, as the defendant, he had no burden of proof at trial and one factor for him to
> consider in whether to testify was whether there was affirmative evidence we felt
> we needed for his case that could only be admitted through him.  I told Mr.
> Russell I thought I could make the arguments he wanted me to make without him
> testifying.

(Id. ¶ 4)[6]

Given (1) the overwhelming evidence linking Russell to the threat call; (2) the

fact that his proposed testimony does not address this evidence; and (3) Freedman's plausible

account of how a decision to testify likely would have hurt Russell's case, Russell has not shown

that he was prejudiced by his failure to testify.

**B.    Failure to Argue that Michael Williams Made the Threat Call**

Russell also argues that "Freedman's failure to investigate Michael Williams as

the 'threat caller' or present the evidence that glaringly points to Michael Williams as the 'threat

caller' was deficient performance."  (23 Civ. 7915, Def. Br. (Dkt. No. 2) at 3)  Russell complains

---

[6]  As to the "opening the door" point and as noted above, at the time of trial, Russell faced
charges in the Eastern District of New York related to his stalking of one of R. Kelly's alleged
victims.  (United States v. Russell, 20 Cr. 427 (E.D.N.Y. Nov. 11, 2022), Dkt. No. 31 (Govt.
Sent. Br. at 1-2)

that "Freedman did not present any information relating to Williams at the trial," and that the failure to do so caused him prejudice because such evidence could have "created reasonable doubt in the minds of the jury." (Id. at 2-3)

Michael Williams was also accused of intimidating alleged victims of R. Kelly. On September 23, 2020, the Government filed an indictment in the Eastern District of New York charging Williams with witness tampering and arson in connection with a June 11, 2020 incident in which Williams set a car on fire in order to threaten a victim of R. Kelly. (United States v. Williams, 20 Cr. 395 (E.D.N.Y. Sept. 23, 2020), Dkt. No. 5 (Indictment)  Williams pled guilty to arson in the Eastern District case on April 19, 2021. (Id., Dkt. No. 21 (Govt. Sent. Br. at 4)  Call records introduced at trial in the instant case indicate that a phone number registered to Williams called the NeueHouse theater at approximately 6:59 p.m. on December 4, 2018 – about 40 minutes before the threat call. (Trial Tr. at 145)

Russell is incorrect in stating that Freedman "did not present any information relating to Williams" at trial, however.  In cross-examining multiple Government witnesses, Freedman elicited testimony that, inter alia, (1) Michael Williams called NeueHouse at 6:59 p.m. on December 4, 2018 – about 40 minutes before the threat call (Trial Tr. at 190); (2) Michael Williams's phone number ends in 8169 – the same four digits as the 1689 phone number associated with Russell (id.); and (3) Government witnesses had not focused on Williams as a potential suspect during their investigation. (Id. at 191, 279)  Freedman did not offer evidence that Williams had pleaded guilty to arson in the Eastern District of New York in connection with an effort to intimidate one of R. Kelly's victims.

In his summation, Freedman argued that – given the similarity between Russell's phone number and Michael Williams' phone number and Williams's phone call to NeueHouse at 6:59 p.m. – there was reasonable doubt as to whether it was Russell who made the threat call:

> When I was asking Mr. Medrano about the fax line, could it have been a fax line? I also asked him about another number that was on here from 6:59 right in the muddle. One minute and 38 – seconds. That sounds like a phone call – from someone named Mike Williams with a number that coincidentally ends in 8169, which seems an awful lot like 1689. You can see how you could get those confused, especially if you're working in a crowded theater and someone just called in a threat, and you don't have a hundred percent conclusive phone log. You see 1689, you remember you got a call from 8169. And, by the way, 8169 is just about half an hour after that anchor point at 6:32 p.m. So if Mr. Krasniqi is saying that he knows that you have the cease and desist call at 6:32, and he thinks that he got the threat call about 10 minutes or 30 minutes later, look, there you go, 30 minutes later. 8169. And then when the police show up, he looks at the call log and there's a number that says 1689. Okay. That's an easy enough mistake. You think he might have made that mistake? That's reasonable doubt.

(Trial Tr. at 363)

Freedman made the same argument in moving for a judgment of acquittal pursuant to Fed. R. Crim. P. 29:

> There isn't evidence to make it clear which phone number was used to make the supposed threat call. It appears that the number that the government believes comes closest, the 1689 number, was a fax line. And there's also evidence that another phone call was made to the NeueHouse from 8169, which is from Mike Williams, that's not in dispute. And I would ask the Court to take judicial notice of the fact that Mr. Williams was a defendant who pled guilty in the Eastern [District] of New York in connection with matters involving Mr. Kelly. That call was at 6:59, and of all this is demonstrated in Government Exhibit 902.

(Id. at 293)

In his affidavit, Freedman explains why – although he suggested to the jury that Williams may have made the threat call – he did not make Williams the centerpiece of Russell's defense:

> I did not want to overemphasize the call from Mr. Williams because I believed its value in creating reasonable doubt was somewhat limited for a few reasons. According to the call records introduced at trial, the call from Mr. Williams to the

14

theater was made nearly an hour before the time when Mr. Krasniqi testified he received the threat call. The call from Mr. Williams was also significantly longer than the length of the threat call as Mr. Krasniqi recalled it. My strategy thus was to highlight the call sufficiently to argue reasonable doubt while not overly emphasizing it at the risk of undermining the argument.

In addition, I did not want to introduce evidence about who Mr. Williams was or the fact that he had pled guilty in the Eastern District of New York to arson against an alleged victim of Mr. Kelly's. In my view, this would have been a strategic mistake as it would have focused the jury on Mr. Kelly, which our trial strategy was designed to avoid. I was also concerned it might open the door to Mr. Russell's own case in the Eastern District of New York, which we had also successfully kept out of evidence at trial in this case. It also would have run the risk that the jury would negatively associate Mr. Russell with Mr. Williams and his conduct, which I wanted to avoid. Finally, it may have focused the jury on other evidence of Mr. Russell's communications with Mr. Williams and with Kash Jones in a way that may have led to Mr. Russell being convicted of the conspiracy count, for which he was instead acquitted. Because of these risks and concerns, I did not focus on Mr. Williams himself or his conviction in front of the jury, but the record will reflect that I did raise it during my Rule 29 argument outside the presence of the jury.

(20 Cr. 538, Freedman Aff. (Dkt. No. 128) ¶¶ 11-12)

Given (1) weaknesses in the theory that Williams made the threat call; (2) the inflammatory nature of Williams' conduct and guilty plea, and R. Kelly's conduct; and (3) the inflammatory nature of the conduct with which Russell had been charged in the Eastern District of New York, Freedman made reasonable strategic choices in pointing the finger at Williams but not making Williams the centerpiece of the defense case.

Moreover, Russell does not explain how additional "investigation on [Freedman's] part would have uncovered facts or arguments" demonstrating that Michael Williams made the threat call. Ruiz v. United States, No. 94 CR. 392 (LAP), 2000 WL 1010828, at *3 (S.D.N.Y. July 21, 2000); see also Raposo v. United States, No. 01 CIV. 5870 (DAB), 2004 WL 1043075, at *4 (S.D.N.Y. May 7, 2004) ("Petitioner has not indicated how further investigation by defense counsel would have altered the outcome of his trial, and has not set forth why the alleged failure to investigate was unreasonable. Accordingly, defense counsel's

alleged failure to investigate cannot support Petitioner's ineffective assistance claim."); Boyd v. Hawk, 965 F. Supp. 443, 452 (S.D.N.Y. 1997) ("'[A] bald assertion that counsel should have conducted a more thorough pretrial investigation fails to overcome the presumption that counsel acted reasonably.'" (quoting Matura v. United States, 875 F.Supp. 235, 237 (S.D.N.Y.1995))); Underwood v. Artuz, No. 95 Civ. 7866 (SAS), 1996 WL 734898, at *4 (S.D.N.Y. Dec. 24, 1996) ("Where a defendant makes no showing as to what exculpatory evidence would have been uncovered by further investigation, there is no reason to think that the result of the proceeding would have been different.").

Because (1) Freedman did, in fact, argue to the jury that evidence related to Michael Williams raised a reasonable doubt as to Russell's guilt; (2) Freedman has proffered plausible strategic reasons for declining to further emphasize evidence related to Williams; and (3) Russell has not identified additional exculpatory evidence that further investigation of Williams would have yielded, Russell has not demonstrated that Freedman's performance was deficient or that it caused him prejudice.

C.   **Whether an Evidentiary Hearing is Necessary**

Russell has requested that this Court conduct an evidentiary hearing concerning the allegations in his petition.  (23 Civ. 7915, Petition (Dkt. No. 1) at 12)

In deciding habeas petitions brought pursuant to 28 U.S.C. § 2255, a district court "has discretion to determine if a testimonial hearing will be conducted."  Campusano v. United States, 442 F.3d 770, 776 (2d Cir. 2006).  "[A] district court need not assume the credibility of factual assertions, as it would in civil cases, where the assertions are contradicted by the record in the underlying proceeding."  Puglisi, 586 F.3d at 214.

Here, both of Russell's grounds for habeas relief are squarely contradicted by the trial record.

As to Russell's failure to testify, the Court allocuted him at trial about that decision.  Russell stated that he was aware that he had an absolute right to testify, but had decided – after consultation with his attorney – that it was not in his best interest to testify.

As to Michael Williams, and contrary to Russell's claim, Attorney Freedman did in fact highlight evidence related to Williams both in cross-examination and in summation, as well as in his Rule 29 argument to the Court.  And Russell has not identified any additional exculpatory evidence related to Williams that further investigation would have revealed.

The record before this Court is sufficient to deny Russell's claims.  Accordingly, Russell's request for an evidentiary hearing is denied.

## CONCLUSION

For the reasons stated above, Russell's petition for a writ of habeas corpus is denied.  Because Russell has not made a substantial showing that he suffered the denial of a constitutional right, a certificate of appealability will not issue.  28 U.S.C. § 2253; see Tankleff v. Senkowski, 135 F.3d 235, 241 (2d Cir. 1998).  The Court further certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for purposes of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is directed to close this case.

Dated: New York, New York
       June 27, 2024

SO ORDERED.

Paul G. Gardephe
United States District Judge